THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WAYNE NELSON, Defendant-Appellant.

First District (2nd Division)   No. 1—92—0690

Opinion filed March 30, 1993.

Mandel Legal Aid Clinic, of Chicago (Mark J. Heyrman, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet L. Powers, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

Defendant, Wayne Nelson, has received more than 10 years of psychological treatment as an inpatient following his acquittal for murder by reason of his insanity. The facility director of the facility housing defendant recommended conditional release of defendant to a halfway house which would supervise defendant while he continues treatment as an outpatient. The trial court denied the director's recommendation, finding that defendant failed to prove by clear and convincing evidence that he would not be a danger to others. Defendant appeals the trial court's denial of the director's recommendation.

We reverse. Since the facility director recommended conditional release with outpatient treatment, the State should have borne the burden of proving that the recommendation was inappropriate. The State failed to present clear and convincing evidence that defendant required inpatient care.

On August 22, 1980, defendant killed his girl friend. At that time, he suffered from severe hallucinations due to paranoid schizophrenia exacerbated by substance abuse. On June 24, 1981, the trial court found him not guilty of murder by reason of insanity and committed

him to the custody of the Illinois Department of Mental Health and Developmental Disabilities (DMHDD) pursuant to section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4). Prior to 1986, defendant received treatment at Chester Mental Health Center (Chester) and the Manteno Mental Health Center (Manteno). In 1986, DMHDD transferred him to the Elgin Mental Health Center (Elgin), where he remains.

On September 27, 1991, the facility director of Elgin wrote to the trial court "to notify [it] as required by Section 1005—2—4(d) of the Criminal Code, that [defendant] is no longer subject to involuntary admission or in need of inpatient treatment." The director attached a report detailing the basis for the recommendation of a supervised outpatient program under which defendant would live in a halfway house where he would receive medication, and he would also continue psychological treatment as an outpatient.

Despite the reminder in the director's letter that the court had responsibility for scheduling a hearing within 30 days, pursuant to section 5—2—4(d)(3) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(d)(3)), the court did nothing prior to October 18, 1991, when defendant filed a "Motion to Set Hearing Date." Defendant sought only a hearing to consider the director's recommendation as required under section 5—2—4(d). He did not request release. The court granted defendant's motion, setting hearing for November 20, 1991. The record does not show the basis for several orders resetting the hearing date. The court finally held the hearing on February 5, 1992, more than 120 days after the director sent the letter recommending conditional release.

At the outset of the hearing, defendant argued that the burden rested on the State because the director recommended conditional release. The State did not object, so the State proceeded first.

The State presented only one witness, Detective Harold Huffmann, who testified to the facts of the killing. Huffmann admitted that he had not spoken with defendant since his trial in 1981, more than a decade before the hearing, and he had no training in mental health. He offered no opinion concerning defendant's mental state and no evidence concerning his mental state at any time since his acquittal.

The State rested. Defendant moved for a finding that the State failed to meet the burden of proof established in section 5—2—4(g), which provides:

"The burden of proof and the burden of going forth with the evidence rest with the State when a hearing is held to review

the determination of the facility director that the defendant should be transferred to a non-secure setting, discharged or conditionally released." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).)

The trial court ruled that the State had "the burden of going forward," which it met by presenting evidence of the offense. The court further ruled that under the statute "[t]he Defendant has a burden to establish by clear and convincing evidence, first of all, that there is no longer a reasonable expectation that he has the possibility of inflicting serious harm *** and that he is no longer in need of in-patient care." The trial court denied the motion for a finding that the State failed to meet its burden of proof.

The acting deputy facility director at Elgin, Ernest Marquez, explained the process by which the facility arrives at a recommendation for a patient's conditional release. First, the patient's caseworker must make a recommendation to the patient's treatment team; if the entire team agrees, it passes the recommendation to Marquez, who reviews it with a psychiatrist or psychologist who is not on the patient's treatment team. If they concur with the recommendation, they tell the treatment team to prepare a formal recommendation packet containing more detailed information. After Marquez reviews the packet, he sends it to the facility director and the medical director at Elgin for their review. If they concur with the recommendation, they forward it to the central office of DMHDD, where the deputy director reviews it. Only if all of these mental health professionals approve of the recommended conditional release will the facility director submit the formal recommendation to the court.

Marquez described the treatment defendant received at Elgin and the treatment and supervision he would receive as an outpatient under the recommended conditional release. Marquez testified that the Grasmere Residential Center (Grasmere) agreed to accept defendant as a resident. Grasmere is a halfway house which can provide the residential supervision recommended as part of defendant's conditional release. The staff at Grasmere would, amongst other things, assure that defendant took his medication daily. Marquez did not know of any occasion on which defendant physically injured anyone in the years he resided at Elgin.

On cross-examination, Marquez admitted that Elgin recommended unsupervised off-grounds passes for defendant in 1989. In the 2½ years following that recommendation, defendant twice verbally threatened staff members, once within a month after denial of the recommendation, and a second time in March 1990. Marquez also had some

recollection, on the State's prompting, that defendant's records indicated that in 1984, while he was a patient at either Chester or Manteno, defendant injured another patient, and he had physical altercations with the staff at Chester in 1984. According to nursing notes, one patient at Elgin complained in March 1990 that defendant was "strong-arming" other patients for money. Marquez discounted the report because the staff found no substantiation for the complaint. There were no reports of misconduct for approximately two years before the hearing.

Dr. Bernard Block, a psychiatrist at Elgin, testified that he met with defendant formally twice a month for a year and a half prior to the hearing, and he saw him daily on the unit. In his opinion defendant suffered from paranoid schizophrenia, but the illness was in remission, and he was not dangerous. Dr. Block stressed that defendant's medical record showed no evidence of physical assault for seven years, and no serious verbal threats for two years. Dr. Block, like Marquez, described the arrangements for continuing outpatient treatment and supervision at Grasmere. Dr. Block emphasized that defendant's medication will be supervised and the court will receive regular reports concerning his progress. If defendant stopped taking his medication, Dr. Block would expect him to decompensate and show signs of psychosis again within a few months after medication stopped. Staff at Grasmere and the clinic treating defendant as an outpatient would see the decompensation. They would also be able to detect defendant's abuse of drugs, were defendant to resume the drug usage which contributed to his psychosis. He expected that defendant would not resume drug use, because defendant had never tested positive for drug use at Elgin in periodic random drug tests, despite the availability of illegal drugs at Elgin, and defendant showed that he was strongly motivated to avoid illegal drugs.

On cross-examination, the State again asked about the recommendation for off-grounds passes which other doctors at Elgin made in 1989, and defendant's subsequent threat to a staff member in March 1990. Dr. Block explained that Elgin took defendant off his antipsychotic medication prior to the incident in March 1990 because defendant experienced some adverse side effects from the medication. After the incident Elgin resumed the antipsychotic medication and there is no plan to discontinue the medication again. The State attempted to impeach Dr. Block by reading notes from defendant's sessions with his therapist, in which defendant discussed "feeling regarding the recent violence towards the unit director." The therapist also noted that defendant seemed "grandiose" and "guarded," and "he can be manip-

ulative." Dr. Block responded that those problems do not require hospitalization and they did not make defendant dangerous; defendant could continue to work on those problems on an outpatient basis.

The judge then asked Dr. Block:

"You can't guarantee, No. 1, that he is going to take his medicine left to his own devices in an uncontrolled environment, right?

A. No way.

Q. You can't guarantee he would not attack anybody?

A. No way can I guarantee that."

Dr. Jonathan Kelly, medical director of the Isaac Ray Center, which is the outpatient clinic where defendant would receive treatment under the conditional release plan, testified that he evaluated defendant as a candidate for the center's outpatient treatment program. He found defendant suitable for conditional release under the treatment plan recommended in the report. He explained that defendant would come to the center at least once a week for therapy, and the staff at Grasmere would give him his medication and watch him take it daily. The center would perform urine screens to assure that defendant did not resume use of illegal drugs.

On cross-examination, Dr. Kelly admitted that in 1981 he reported to the court his opinion that defendant was suitable for a closely monitored outpatient treatment program with rehabilitation for drug abuse. Dr. Kelly also admitted that after 1981, defendant on occasion behaved threateningly or violently, when he did not take his antipsychotic medication. The record includes no indication that defendant had refused to take medication at any time within seven years prior to the hearing. Dr. Kelly testified that if defendant failed to take his medication, Dr. Kelly would start intramuscular medication which would preclude any problem of lack of compliance.

The trial court reiterated its earlier holding that "the defendant must establish by clear and convincing evidence that he is entitled to *** conditional release." The court found that the opinions of defendant's doctors were insufficient to meet defendant's burden of "show-[ing] that he is no longer a danger to himself, and, most importantly, to others." On that basis the court ruled: "Your motion for conditional release is denied." Defendant's attorney immediately pointed out that he had not moved for conditional release. The court repeated: "He is petitioning for conditional discharge." When defense counsel pointed out that the hospital requested the conditional release, the court said: "I have ruled. You can file the notice of appeal." Defendant has remained at Elgin for another year pending this appeal.

Both parties agree that Elgin recommended defendant's conditional release, that defendant moved to set a hearing date, and that the trial court ruled that defendant bore the burden of proving by clear and convincing evidence that he is entitled to conditional release. The parties also agree that under section 5—2—4(g), when the court reviews a facility director's recommendation of conditional release, the State bears the burden of proving, by clear and convincing evidence, that the defendant should not be conditionally released. (See *People v. Reed* (1984), 126 Ill. App. 3d 1020, 1023, 467 N.E.2d 1158.) The parties disagree on whether the hearing in this case was a hearing to review the facility director's recommendation.

■ The State contends that defendant's motion to set a hearing date constituted a "petition" within the meaning of section 5—2—4(e), and the court held a hearing on that petition, for which the petitioner bore the burden of proof. If this is so, then the court held only the hearing required under section 5—2—4(e); the court has never held the hearing required under section 5—2—4(d) to review the hospital's recommendation. According to section 5—2—4(g), the State must bear the burden of proof at a hearing to review a hospital's recommendation of conditional release. The State concedes that Elgin sent the proper notice to trigger the requirement for a hearing under section 5—2—4(d), but on the State's theory, the court entirely ignored its statutory duty of holding a hearing to review the recommendation. The statute does not allow a hearing on a defendant's petition, pursuant to section 5—2—4(e), to defeat the requirement of a hearing on the hospital's recommendation, pursuant to section 5—2—4(d). Therefore, even if defendant's motion to set hearing date could be considered a "petition" under section 5—2—4(e), the trial court had a statutory duty to hold a separate hearing on the hospital's recommendation, at which the State would bear the burden of proof.

Moreover, the State's argument is inconsistent with the pleadings on file and the trial court's rulings. Defendant filed no petition for conditional release, and in the motion he filed he sought as relief only the setting of a date to review the hospital's recommendation. Defendant did not, in any pleading, request conditional release. The trial court acknowledged that the hearing was not a hearing on any petition filed by defendant when it ruled that the State had the burden of production: under the statute, if the hearing is on a defendant's petition for conditional release, the petitioner has the burdens of production and proof; the State bears the burden of production only in hearings to review a hospital's recommendation.

Section 5—2—4(d) required the court to hold a hearing on the facility director's recommendation. Section 5—2—4(g) states that "[t]he burden of proof and the burden of going forth with the evidence rest with the State" at hearings required by section 5—2—4(d). (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).) The State concedes that the trial court placed the burden of proof on defendant. Defendant has established that the trial court contravened express statutory language and pertinent case law by imposing upon him the burden of proof in this hearing to review the hospital's recommendation. See *In re Commitment of Risner* (1982), 110 Ill. App. 3d 368, 442 N.E.2d 541.

The trial court apparently decided that the statute required the defendant to prove by clear and convincing evidence that he qualified for conditional release even when the hospital recommended such release. The court treated the case as though there were a strong presumption that the defendant continues to meet the criteria for inpatient treatment, which he and the hospital must overcome by clear and convincing evidence when the hospital recommends release. The statute cannot support this interpretation. Instead, the statute sets up a strong presumption that the professional staff treating the defendant is best capable of determining the proper treatment for defendant and whether he remains a danger to others. When any party, either the State or the defendant, seeks to defeat the hospital's recommended course of treatment, that party must establish, by clear and convincing evidence, that the recommendation is inappropriate. See Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4; *Risner*, 110 Ill. App. 3d 368, 442 N.E.2d 541.

Both parties contend that this court can find as a matter of law whether the evidence presented meets the proper burden. Although this court must defer to the trial court's findings of fact, all of the trial court's findings in this case, like its final finding that defendant failed to meet his burden of showing that he is not dangerous, hinge on the trial court's mistaken belief that defendant bore the burden of proof. The trial court made no findings which did not refer to defendant's failure to meet his burden, so there are no factual findings to which this court must defer.

The State presented no witnesses and no evidence apart from testimony regarding the killing more than 12 years ago for which defendant was found not guilty by reason of insanity. Defendant's three witnesses, all qualified experts who evaluated defendant based on their personal interviews with him and his medical record, testified in support of Elgin's recommendation that defendant was not a danger to himself or others as long as he took his medication, and he was

no longer in need of inpatient treatment. They testified that he had not acted violently or gotten involved in any physical altercation for more than seven years, and he had not even made any verbal threats for two years. The one incident two years before the hearing in which defendant verbally threatened a staff member occurred when the hospital tried taking defendant off his medication.

The State argues that it impeached Marquez by showing that Elgin recommended off-grounds passes in 1989, and defendant "made other threats to staff members in September of 1989 and had been involved in several physical altercations prior to that time." Marquez testified that he did not know the nature of any alleged threats, but he knew that the staff was concerned about defendant's reaction to the court hearing in August 1989, where the trial court denied the hospital's recommendation for off-grounds passes. The "physical altercations" were not only prior to September 1989, they were prior to 1985. The State also contends that Marquez impeached himself when he admitted that another patient complained that defendant was strong-arming other patients for money. Marquez said that the psychiatric patient's report was unsubstantiated. The State presented no evidence to substantiate the report, no evidence of physical altercations within seven years of the hearing, and no evidence of verbal altercations within two years of the hearing.

The State contends that it impeached Dr. Block with his testimony that defendant had on some occasions in the past refused to take his medication, and when he had done so, he had become "aggressive, *** argumentative and dangerous." The State did not seek to specify when defendant had refused medication, but Dr. Block's other testimony clarifies that the incidents must have occurred in the first four years of defendant's hospitalization. Dr. Block knew of no occasion in the past seven years, out of defendant's 11 years of hospitalization, on which defendant had refused medication or gotten involved in a physical altercation. The only verbal altercation within two years occurred when the hospital took defendant off his medication; defendant had not refused the medication and took it willingly when the hospital resumed the treatment. The State did not effectively impeach the expert witnesses.

The State, like the trial court, relies most heavily on the expert's statements that they could not guarantee that defendant would continue to take his medication and that he would not resume use of illegal drugs. As this court held in *People v. Smith* (1984), 126 Ill. App. 3d 5, 9, 466 N.E.2d 1226:

"Expert testimony that defendant may have difficulty adjusting to the stresses of noninstitutional life is not sufficient to sustain a finding requiring involuntary commitment. [Citation.] Neither is the possibility that defendant may not comply with the prescribed regimen of treatment [citation], nor that defendant may resume abuse of alcohol."

The court in *Smith* reversed the trial court's determination that the defendant, an insanity acquittee, had to remain in the custody of DMHDD, and remanded for determination of an appropriate plan for outpatient treatment.

Here the witnesses all testified that Grasmere would supervise defendant's medication. If defendant avoided medication, the staff at Grasmere and the center where defendant would continue his outpatient treatment would observe the deterioration in his behavior, and they would impose intramuscular medication. The State did not in any manner impeach the witnesses' consistent testimony that when defendant is medicated, he is not a danger to himself or others.

In *Risner*, the appellate court reversed a trial court order denying an insanity acquittee conditional release because the trial court had improperly imposed the burden of proof on the defendant. The court held:

"Although the burden rests on the State to establish, by clear and convincing evidence, that respondent's release does not meet the statutory standard, the State presented no evidence tending to show that the release was inappropriate. On the contrary, we note that all testimony before the trial court evidenced respondent's progress since his commitment to the custody of the Department and his compliance with the treatment program. The State's witness, respondent's psychiatrist, and the professional staff of Grasmere concurred in the facility director's recommendation that respondent be conditionally released. Based on the record before us, there can be no finding supported by clear and convincing evidence that the proposed release plan did not provide reasonable assurances for respondent's further treatment and for the safety of others." (*Risner*, 110 Ill. App. 3d at 373.)

The court found no need to remand for retrial.

■ The reasoning of *Risner* applies with full force to the proceeding herein. The evidence as a whole, construed in the light most favorable to the State, cannot be considered clear and convincing evidence that the proposed conditional release of defendant from Elgin to Grasmere does not reasonably assure the safety of others.

At oral argument, we requested information on defendant's current condition, in view of the long delay since the facility director recommended conditional release. The current report from Elgin indicates that defendant has not shown any dangerous behavior in the past year. He has continued to act appropriately, and he has even made some progress in dealing with his mental illness despite the trial court's denial of the hospital's recommendation for conditional release. Defendant's "[c]linical team continues to view him as clinically stable," and it still recommends his conditional release. We see no need to remand for retrial. We remand for the entry of an order permitting the hospital to conditionally release defendant "under such conditions *** as will reasonably assure the defendant's satisfactory progress in treatment *** and the safety of the defendant or others." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a).) We find that the proposed placement at Grasmere, with outpatient treatment at the Isaac Ray Center, is an appropriate plan for defendant's treatment, if that placement is still available.

For the reasons stated above, the trial court's order directing the facility director at Elgin to retain custody of defendant is reversed and the cause is remanded for proceedings consistent with this order.

Reversed and remanded with directions.

HARTMAN and SCARIANO, JJ., concur.